## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIZABETH VAUGHN, Derivatively on Behalf of Nominal Defendant TELADOC HEALTH, INC., | ) ) ) |
| | ) Case No. _____ |
| Plaintiff, | ) |
| | ) JURY TRIAL DEMANDED |
| v. | ) |
| | ) |
| DAVID B. SNOW, JR., KAREN L. DANIEL, SANDRA FENWICK, WILLIAM H. FRIST, CATHERINE JACOBSON, THOMAS G. MCKINLEY, KENNETH PAULUS, DAVID L. SHEDLARZ, MARK D. SMITH, JASON GOREVIC, and MALA MURTHY, | ) ) ) ) ) ) ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| TELADOC HEALTH, INC., | ) |
| | ) |
| Nominal Defendant. | ) |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Elizabeth Vaughn ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Teladoc Health, Inc. ("Teladoc" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of publicly available documents concerning Teladoc, transcripts of conference calls with analysts, announcements concerning the Company,

filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by, and regarding, Teladoc, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Teladoc against certain officers and members of the Company's Board for breaches of their fiduciary duties to the Company and its shareholders between October 28, 2021 and April 27, 2022 (the "Relevant Period").

2.     Teladoc provides virtual healthcare services in the U.S. and internationally through Business-to-Business ("B2B") and Direct-to-Consumer ("D2C") distribution channels. Teladoc's services and solutions cover hundreds of medical subspecialties from non-urgent, episodic needs like flu and upper respiratory infections, to chronic, complicated medical conditions. The Company's BetterHelp D2C product, meanwhile, is a market leader in the D2C therapy market and addresses issues including mental health. Through its integrated technology platforms, the Company completed approximately 15.4 million telehealth visits in 2021.

3.     Teladoc touts itself as "the first and only company to provide a comprehensive and integrated whole person virtual healthcare solution that both provides and enables care for a full spectrum of clinical conditions[.]" Despite recent market concerns over new entrants to the telehealth field, such Amazon.com, Inc. ("Amazon") and Walmart Inc. ("Walmart"), the Company has continued to assure investors of the Company's dominant market position in the industry.

4.     In February 2022, for example, Teladoc forecasted full year ("FY") 2022 revenue of between $2.55 and $2.65 billion, as well as an adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") range of $330 to $355 million, on anticipated

continued growth through its competitive advantages.

5.     Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) increased competition, among other factors, was negatively impacting Teladoc's BetterHelp and chronic care businesses; (ii) the growth of the BetterHelp and chronic care businesses was less sustainable than the Individual Defendants had led investors to believe; (iii) as a result, Teladoc's revenue and adjusted EBITDA projections for FY 2022 were unrealistic; and (iv) as a result, Teladoc would be forced to recognize a significant non-cash goodwill impairment charge.

6.     On April 27, 2022, Teladoc announced its first quarter 2022 ("Q1 2022")  financial results, including revenue of $565.4 million, which missed consensus estimates by $3.23 million, and a "[n]et loss per share of $41.58, primarily driven by [a] non-cash goodwill impairment charge of $6.6 billion or $41.11 per share[.]" Additionally, the Company lowered its FY 2022 revenue guidance to $2.4-$2.5 billion and adjusted EBITDA guidance to $240-$265 million "to reflect dynamics we are currently experiencing in the [D2C] mental health and chronic condition markets." On a conference call with investors and analysts that day to discuss Teladoc's Q1 2022 results, the Individual Defendants largely attributed the Company's poor performance, revised FY 2022 guidance, and $6.6 billion non-cash goodwill impairment charge to increased competition in its BetterHelp and chronic care businesses.

7.     On this news, the Company's share price fell $22.48, or over 40%, to a closing price of $33.51 per share on April 28, 2022.

8.      As a result of the foregoing, a securities fraud class action was filed against the Company and certain of its officers, captioned *Schneider v. Teladoc Health, Inc., et al.*, Case No. 1:22-cv-04687 (S.D.N.Y.) (the "Securities Action"). The Securities Action has exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Nominal Defendant Teladoc is headquartered in this District and conducts business in this District.

## PARTIES

*Plaintiff*

14.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Teladoc.

*Nominal Defendant*

15.     Nominal Defendant Teladoc is incorporated under the laws of Delaware with its principal executive offices located in Purchase, New York.  Teladoc's common stock trades on the

NASDAQ under the ticker symbol "TDOC."

***Individual Defendants***

16.     Defendant David B. Snow, Jr. ("Snow") is Chairman of the Board and has served as a director of the Company since February 2014. Snow also serves as a member of the Board's Compensation Committee and Nominating and Corporate Governance Committee. According to the Company's public filings, Snow received $332,496 in 2021 in compensation from the Company.

17.     Defendant Karen L. Daniel ("Daniel") has served as a director of the Company since November 2020. Daniel also serves as a member of the Board's Audit Committee. According to the Company's public filings, Daniel received $279,996 in 2021 in compensation from the Company.

18.     Defendant Sandra Fenwick ("Fenwick") has served as a director of the Company since November 2020. Fenwick also serves as a member of the Board's Nominating and Corporate Governance Committee and Quality of Care and Patient Safety Committee. According to the Company's public filings, Fenwick received $279,996 in 2021 in compensation from the Company.

19.     Defendant William H. Frist ("Frist") has served as a director of the Company since September 2014. Frist also serves as the Chair of the Quality of Care and Patient Safety Committee and as a member of the Compensation Committee. According to the Company's public filings, Frist received $287,496 in 2021 in compensation from the Company.

20.     Defendant Catherine Jacobson ("Jacobson") has served as a director of the Company since February 2020. Jacobson also serves as a member of the Audit Committee. According to the Company's public filings, Jacobson received $279,996 in 2021 in compensation

from the Company.

21.     Defendant Thomas G. McKinley ("McKinley") has served as a director of the Company since November 2009. McKinley also serves as Chair of the Compensation Committee. According to the Company's public filings, McKinley received $291,246 in 2021 in compensation from the Company.

22.     Defendant Kenneth H. Paulus ("Paulus") has served as a director of the Company since February 2017. Paulus also serves as Chair of the Nominating and Corporate Governance Committee and member of the Quality of Care and Patient Safety Committee. According to the Company's public filings, Paulus received $284,996 in 2021 in compensation from the Company.

23.     Defendant David L. Shedlarz (Shedlarz") has served as a director of the Company since September 2016. Shedlarz also serves as Chair of the Audit Committee. According to the Company's public filings, Shedlarz received $291,246 in 2021 in compensation from the Company.

24.     Defendant Mark D. Smith ("Smith") has served as a director of the Company since October 2018. Smith also serves as a member of the Nominating and Corporate Governance Committee and the Quality of Care and Patient Safety Committee. According to the Company's public filings, Smith received $279,996 in 2021 in compensation from the Company.

25.     Defendant Jason Gorevic ("Gorevic") has served as Teladoc's Chief Executive Officer ("CEO") at all relevant times. According to the Company's public filings, Gorevic received $11,637,898 in 2021 in compensation from the Company. Gorevic is named as a defendant in the Securities Action.

26.     Defendant Mala Murthy ("Murthy") has served as Teladoc's Chief Financial Officer ("CFO") at all relevant times. According to the Company's public filings, Murthy received

$4,130,608 in 2021 in compensation from the Company. Murthy is named as a defendant in the Securities Action.

27.     Defendants Snow, Daniel, Fenwick, Frist, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Gorevic are herein referred to as the "Director Defendants."

28.     The Director Defendants and Murthy are herein referred to as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers and/or directors of Teladoc, and because of their ability to control the business and corporate affairs of Teladoc, the Individual Defendants owed Teladoc and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Teladoc in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Teladoc and its shareholders so as to benefit all shareholders equally.

30.     Each director and officer of the Company owes to Teladoc and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Teladoc, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of Teladoc were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Teladoc, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

35.     To discharge their duties, the officers and directors of Teladoc were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Teladoc were required to, among other things:

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Teladoc's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Teladoc conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Teladoc and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Teladoc's operations would comply with all applicable laws and Teladoc's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

36.     Each of the Individual Defendants further owed to Teladoc and the shareholders the duty of loyalty requiring that each favor Teladoc's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

37.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Teladoc and were at all times acting within the course and scope of such agency.

38.     Because of their advisory, executive, managerial, and directorial positions with Teladoc, each of the Individual Defendants had access to adverse, non-public information about the Company.

39.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Teladoc.

## TELADOCS'S CODE OF BUSINESS CONDUCT AND ETHICS

40.     Teladoc's Code of Conduct, effective September 23, 2021, applies to all individuals who work for, or on behalf of, the Company, including directors, officers, and employees (collectively, "Employees"). All Employees are expected to read, understand, and comply with the Code of Conduct.

41.     The Code of Conduct contains a letter from CEO Gorevic, which states, *inter alia*:

Teladoc Health has seen tremendous growth over the past few years. As new companies join us and we enter new markets across the world, our business becomes more complex. There is one thing, however, that does not change and that is Teladoc Health's reputation for integrity, professionalism, and fairness. This Code of Business Conduct and Ethics, which has been approved and endorsed by

our Board of Directors, summarizes the standards that must guide our actions in ways that are consistent with all of our Core Values, in particular:

- We lead with integrity, accountability, and transparency
- We respect each other and value succeeding together
- We stand up for what's right

At Teladoc Health, we strive to foster a culture of honesty and accountability. Our commitment to the highest level of ethical conduct should be reflected in all of the Company's business activities including, but not limited to, relationships with employees, customers, suppliers, competitors, the government, and the public, including our shareholders. The Code is your guide to conducting business on behalf of Teladoc Health. All of our employees, officers, and directors must conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior.

42.     In a section describing its "Overarching Principles," the Code of Conduct states,

among other things:

**We comply with laws, rules, and regulations**

We lead with integrity, accountability, and transparency and are committed to conducting our business affairs with honesty and in full compliance with all applicable l laws, rules, and regulations wherever we conduct business around the world.

We will not tolerate violation of any applicable laws by any Employee. Nor will Teladoc Health tolerate the disregard of Company policies or engaging in unethical dealings in connection with the Company's business.

43.     In a section titled "Accurate Reporting and Quality of Public Disclosures," the Code

of Conduct states:

The Company has a responsibility to provide full and accurate information in our public disclosures, in all material respects, about the Company's financial condition and results of operations. Our reports and documents filed with or submitted to the U.S. Securities and Exchange Commission and our other public communications shall include full, fair, accurate, timely, and understandable disclosures.

Teladoc Health's records must meet the highest standards of accuracy and completeness. You must make open and full disclosure to, and cooperate fully with, outside accountants in connection with any audit or review of Teladoc Health's financial statements.

Teladoc Health relies on you to come forward if you feel that you are being pressured to prepare, alter, conceal, or destroy documents in violation of Company policy. In addition, you must report to the Legal Department if you have reason to believe that any of our books and records are being maintained in an inaccurate or incomplete manner, or if you have reason to believe that someone has made a misleading, incomplete, or false statement in connection with an investigation, audit, examination, or filing with a government agency or regulatory body.

## TELADOC'S AUDIT COMMITTEE CHARTER

44.     Teladoc's Audit Committee Charter, effective May 23, 2019, states that the purpose of the Audit Committee is to "assist the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and independent auditor."

45.     In a section relating to the Audit Committee's duties and responsibilities with respect to annual financial statements and Form 10-K review, the Audit Committee Charter states that the Audit Committee must "review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations.'" A section relating to quarterly financial statements imposes substantially similar duties and requirements with respect to Form 10-Q review.

46.     In a section relating to earnings releases, the Audit Committee Charter states that the Audit Committee "must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies."

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

47.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

48.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

49.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

50.     Each of the Individual Defendants aided, abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

51.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Teladoc and was at all times acting within the course

and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

*Background*

52.     Teladoc provides virtual healthcare services in the U.S. and internationally through

B2B and D2C distribution channels, serving employers, health plans, hospitals and health systems,

insurance and financial services companies, and individual members. The Company offers various

virtual products and services addressing, among other medical issues, mental health through its

BetterHelp D2C product, and chronic conditions.

53.     Teladoc touts itself as "the first and only company to provide a comprehensive and

integrated whole person virtual healthcare solution that both provides and enables care for a full

spectrum of clinical conditions[.]" Despite recent market concerns over new entrants to the

telehealth field, such Amazon and Walmart, the Company has continued to assure investors of the

Company's dominant market position in the industry.

*False and Misleading Statements During the Relevant Period*

54.     On October 28, 2021, the Company held a conference call with investors and

analysts to discuss the Company's third quarter 2021 results (the "Q3 2021 Earnings Call").

Defendant Gorevic provided preliminary FY 2022 revenue guidance of $2.6 billion and

downplayed anticipated headwinds to the Company's chronic care business, stating, in relevant

part:

> I want to provide some initial perspective on our expectations for 2022. As you
> know, it's not our typical practice to comment on forward outlook at this point in
> the year. But we believe the additional color is appropriate given our insights at this
> stage of the selling season and our outlook on consolidated revenue growth for next
> year. First, we are as confident as ever in our multiple levers for growth in 2022
> and beyond. Our unique ability to deliver longitudinal, Whole-person care is a
> significant competitive advantage. And our leading position in all B2B and DTC
> channels enables us to fuel continued growth.

14

Given our insights at this stage of the selling season, our preliminary outlook for consolidated revenue next year is approximately $2.6 billion…Chronic care is just one of those levers for growth and is increasingly converging with others . . .. However, as we work through the 2022 planning process, we expect to be more conservative about growth expectations for standalone Chronic Care.

Our preliminary outlook assumes standalone Chronic Care revenue will grow approximately 25% to 35%. And we believe strongly that our Chronic Care capabilities will also continue to unlock growth across our integrated suite of products and solutions. Our Whole-person care approach is clearly resonating with clients and consumers as their expectations for virtual healthcare delivery continue to move up the value chain and expand from transactional episodic demand toward integrated longitudinal care.

55.     In response to a Credit Suisse analyst's request for more color on the Company's conservative view of chronic care for 2022, Defendant Gorevic responded, in relevant part:

[W]hen we talk about Chronic Care management and our outlook, we've done a lot of work to make sure that we're very focused on the discipline that we bring and have always brought to our management of the pipeline and are forecasting process. . .. We've -- I would say have been very successful in selling into the health plan channel over the course of this year and our pipeline's still looks strong with new opportunities. Many of those opportunities, either the existing sales that we've made or the ones in our pipeline are the permission and the partnership with the health plan to go sell to their self-insured clients.

That takes a couple of years to unlock the full value of it because you have to go through the renewal cycle and the selling cycle to those self-insured clients. And so, we're trying to be very realistic about the sort of on-ramp of those clients in the health plan segment. With respect to the employer market, that's a market where our products are extremely attractive. And historically, we've been very successful at selling into the employer market directly when we sell directly to large employers. That's a market where the benefits managers have, I would say, paused over the course of this year more than we've seen it in the past and it's really due to COVID and them being focused on the pandemic and return to work.

56.     Despite expressing measured caution over the staggered "on-ramp" of certain clients and the ongoing COVID-19 pandemic, Defendant Gorevic continued to assure investors, stating:

As I talked to our employer sales team, they see th[e employer market] picking up substantially as we get to the end of the year. And people are starting to get back to the office. And the benefits manager is starting to think about more of a return to normal. And so, they are optimistic as we look into next year's selling cycle.

15

57.    Also on the Q3 2021 Earnings Call, Defendant Gorevic addressed potential slowdowns in two other chronic care channels, while again simultaneously assuring investors of the limited impact of those market conditions:

> And then there are two channels that I would say are just moving a little more slowly than we had originally anticipated. And again, we want to be conservative in our outlook. The broker channel, we had high expectations and we're just starting to see that pick up now. It took a while to educate the brokers.
>
> We have a large distributed broker network. And it took a little while to educate them on a product set that they really didn't have access to before. We're now starting to see that pick up substantially and we're excited about next year's selling season for that. And then lastly, International. I think the international markets, we have to go through some both regulatory hurdles in terms of local certifications and approvals, but also localizing our products to various international markets. And we're doing that in a fairly methodical approach, market-by-market. So, I think we will see growth internationally, but we don't have, really, anything in our plan for next year on a substantial basis.
>
> And then maybe the last thing I'll say is that's been -- I would say positively offset by our growth in the hospital and health system market where we've, we've noted before that we've seen especially risk-bearing hospitals really lean into the Chronic Care solutions. And that's going better than we had expected. So, when you put all of that together and we take, I would say critical look at the pipeline and our forecast, that's where we landed on that 25% to 35% outlook. Again, that's a contributor to our overall outlook of approximately 2.6 billion in revenue next year.

58.    On February 22, 2022, Teladoc issued a press release announcing the Company's fourth quarter 2021 ("Q4 2021") and FY 2021 results. That press release highlighted "*[f]ull year 2022 Revenue guidance of $2.55 to $2.65 billion, representing 25% to 30% growth*," and provided FY adjusted EBITDA guidance of $330-$355 million.

59.    The February 22, 2022 press release quoted Defendant Gorevic as stating, in relevant part:

> Teladoc Health took a huge step forward in bringing true whole-person care to life for consumers and clients in 2021 . . . . We successfully delivered against performance metrics, solidified our position as the partner of choice for our clients and connected millions of consumers with high-quality care. . . .  And Teladoc Health is clearly differentiated by the breadth and depth of our offerings, an integrated suite of virtual care services that connect individuals with chronic,

16

primary, acute and specialty care. We saw meaningful growth and penetration across several key areas of our business, [including] in mental health through [inter alia] BetterHelp in the [D2C] space. . . .

We are proud of the role Teladoc Health has played in leading this transformation and are equally excited about our role in 2022 and beyond as we continue to innovate, further evolving whole-person care, introducing new services like Chronic Care Complete, expanding into new markets and deepening our relationships with our clients and consumers[.]

60.    Also on February 22, 2022, Teladoc held a conference call with investors and analysts to discuss the Company's Q4 2021 and FY 2021 results (the "Q4/FY 2021 Earnings Call"). On that call, Defendant Gorevic expressed his confidence in meeting Teladoc's revenue guidance for FY 2022, stating, in relevant part:

For [FY 2022], we expect revenue to be in the range of $2.55 billion to $2.65 billion, representing growth of 25% to 30%. Our expectations for strong growth are a result of the broad-based momentum we continue to see across our suite of products and services and across geographies. We have over 90 million total individuals with access to the Teladoc platform today, and we see a significant opportunity for long-term growth by expanding our relationships and going deeper with our existing clients and members as we execute against our key strategic priorities across primary care, mental health and chronic care solutions.

61.    With respect to Teladoc's revenue and adjusted EBITDA guidance for FY 2022, Defendant Murthy stated the following on the Q4/FY 2021 Earnings Call:

For [FY] 2022, we expect revenue to be in the range of $2.55 billion to $2.65 billion, representing growth of 25% to 30% over the prior year. We expect total membership of 54 million to 56 million members, representing growth of 1% to 5% year-over-year, with the remainder of revenue growth driven by expanding revenue per member driven both by increased product penetration and product mix.

We expect adjusted EBITDA in 2022 to be in the range of $330 million to $355 million, representing a 12.9% to 13.4% adjusted EBITDA margin and an expansion of approximately 90 to 140 basis points over 2021 after normalizing for last year's purchase price accounting benefit. We expect total visits in 2022 to be between 18.5 million and 20 million visits, representing growth of 20% to 30% over the prior year.

62.    Additionally, on the Q4/FY 2021 Earnings Call, in discussing "the expected cadence of revenue and adjusted EBITDA growth over the course of [FY 2022,]" Defendant

Murthy stated, in relevant part:

> On the revenue side, we expect the timing of new chronic care client onboarding to be more heavily weighted towards the second half of this year. This includes the launch of large new health plan clients signed over the past several months . . . which are scheduled to onboard in the second half of this year. We, therefore, expect to see strong sequential growth in revenue over the course of the year. Specific to the second quarter, we expect an approximate $40 million to $50 million step-up in revenue from 1Q to 2Q.

> On the expense side, we normally see higher engagement marketing spend in the first half of the year as we prepare to onboard new clients and members. It's also typical for us to see higher advertising spend early in the year as we take advantage of lower media pricing in the market following the conclusion of the more expensive holiday season. We expect that to be the case again this year, as we have seen a more advantageous media buying landscape early this year, which has resulted in a slightly lower customer acquisition cost.

> This will impact the quarterly cadence of adjusted EBITDA, and we expect will result in a significant margin expansion progression over the course of 2022, particularly in the second half due to our expected revenue and enrollment ramp for the chronic care programs launching later this year as well as the typical seasonality of advertising spend over the course of the year.

63.     On the same call, Defendant Murthy also assured investors of Defendants' visibility into Teladoc's second half of FY 2022 results, stating, in relevant part:

> It's important to note that the revenue and EBITDA ramp described is not dependent on significant new sales. The deals mentioned are contracts that have been signed over the past several months, but are disproportionately scheduled to onboard in the second half [of 2022]. And we, therefore, have good visibility into the second half revenue and EBITDA progression.

64.     On February 28, 2022, Teladoc filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K assured investors of the Company's continued dominant market position and unique competitive strengths, stating, *inter alia*:

> We believe that Teladoc Health is the leading global virtual healthcare provider because of our strong competitive advantages that address the most pressing challenges and trends in the delivery of healthcare around the world. We believe our history of innovation and long-standing operational excellence provide us with significant first-mover advantages, and we continue to invest and expand our

18

services and geographic footprint globally. As the first comprehensive virtual healthcare company providing whole person care at scale, we have pioneered solutions and created what we believe are collectively the telehealth industry's first and only offerings of their kind.

*         *         *

We believe that we are the first and only company to provide a comprehensive and integrated whole person virtual healthcare solution that both provides and enables care for a full spectrum of clinical conditions, including wellness and prevention, acute care, chronic conditions, and complex healthcare needs.

65.    With respect to Teladoc's BetterHelp business, the 2021 10-K stated, in relevant

part:

We plan to continue driving growth through investments in our D2C channels. . . . BetterHelp is the leader in the D2C therapy market, both in terms of the number of individuals enrolled and the number of providers who provide services on the platform. The scale of our data and provider network, powered by our data science capabilities, creates a competitive advantage for us in providing an optimal match of an individual with a provider, increasing the rate of success in therapy. We leverage diverse customer acquisition channels and increased organic sources of traffic, which reduces dependence on any single source of member acquisition. Even with our strong historical growth, we believe there is substantial untapped growth potential, both domestically and internationally, as almost half of BetterHelp members have never sought therapy before.

66.    With respect to Teladoc's chronic care business, the 2021 10-K stated that "[o]ur

chronic care programs are one of the key components of our whole person virtual care platform

that we believe position us to drive greater engagement with our platforms and increased revenue."

67.    The statements above were materially false and misleading because Defendants

made false and/or misleading statements, as well as failed to disclose material adverse facts about

the Company's business, operations, and prospects. Specifically, the Individual Defendants made

false and/or misleading statements and/or failed to disclose that: (i) increased competition, among

other factors, was negatively impacting Teladoc's BetterHelp and chronic care businesses; (ii) the

growth of the BetterHelp and chronic care businesses was less sustainable than the Individual

Defendants had led investors to believe; (iii) as a result, Teladoc's revenue and adjusted EBITDA

projections for FY 2022 were unrealistic; and (iv) as a result, Teladoc would be forced to recognize a significant non-cash goodwill impairment charge.

***The Truth Emerges***

68.     On April 27, 2022, Teladoc issued a press release announcing its Q1 2022 financial results, including revenue of $565.4 million, which missed consensus estimates by $3.23 million, and "[n]et loss per share of $41.58, primarily driven by [a] non-cash goodwill impairment charge of $6.6 billion or $41.11 per share[.]" In addition, the Company lowered its FY 2022 revenue guidance to $2.4-$2.5 billion, down from previous guidance of $2.55-$2.65 billion, and revised its FY 2022 adjusted EBITDA guidance to $240-$265 million, down from previous guidance of $330-$355 million, "to reflect dynamics we are currently experiencing in the [D2C] mental health and chronic condition markets." The press release quoted Defendant Gorevic as stating:

> In the D2C mental health market, higher advertising costs in some channels are generating a lower-than-expected yield on our marketing spend. In the chronic condition market, we are seeing an elongated sales cycle as employers and health plans evaluate their long-term strategies to deliver the benefits and care that their populations need.

69.     Also on April 27, 2022, Teladoc held a conference call with investors and analysts to discuss the Company's Q1 2022 results. Defendant Gorevic addressed how increased competition, lower growth, and lower yield from marketing spend were negatively impacting the Company's BetterHelp results, stating:

> Over the past several weeks, we've seen lower-than-expected yield on marketing spend for BetterHelp, which is a reversal of the trends we experienced exiting 2021 and in the early part of 2022. One example of this is paid search advertising, where we've seen a notable increase in rates for keywords associated with online therapy.

> We believe the biggest driver of this dynamic is smaller private competitors pursuing what we think are low- or no-return customer acquisition strategies in an attempt to establish market share.

> Some of those same providers are also exploiting the temporary suspension of certain regulations associated with the national health emergency concerning the

prescription of controlled substances. We believe these strategies are unsustainable in the long-term. This dynamic is likely to persist at least throughout the remainder of this year, however, resulting in growth and margin contribution from BetterHelp that is below our expectation in February.

*        *        *

[G]iven the persistency of these trends over the past several weeks and the broader economic backdrop, we've incorporated this updated view into our forward outlook, including an assumed 10% lower revenue yield per dollar of ad spend for the full year.

70.     With respect to how increased competition and other factors were negatively impacting the Company's chronic care results, Defendant Gorevic stated:

[W]e're also seeing our chronic care sales pipeline developed more slowly than anticipated. Last October, we discussed two trends in the marketplace that we saw leading to an elongated selling cycle. The first was in the employer market, where we saw benefit managers focused on COVID and return to work, which we felt was contributing to a longer decision-making process. The second was a large pipeline of health plan deals that were simply harder to predict when it comes to timing given the size and complexity of those clients.

At the beginning of this year, we were encouraged by very strong fourth quarter bookings and a robust late-stage pipeline. However, as we progressed through the first part of the year, we're seeing clear signs of the slower bookings pace continuing.

In addition to the factors we discussed last fall, we're seeing clients inundated with a number of new smaller point solutions, which has created noise in the marketplace

. . . . [W]e are in the process of taking a closer look at some of these forces that are impacting the near-term conversion of pipeline to revenue, and we'll continue to make adjustments as necessary to address them.

. . . [W]e're not seeing deals progress at the pace that we expected.

71.     Additionally, Defendant Gorevic revealed that BetterHelp had played a disproportionate role in necessitating Teladoc's revised FY 2022 guidance, stating, *inter alia*:

When comparing the impact to guidance from the items we've just discussed, approximately three quarters of the reduction to our 2022 revenue outlook is driven by lower expected growth at BetterHelp with the remainder primarily attributed to the lower expected revenue from our suite of chronic care products.

21

For adjusted EBITDA, approximately two thirds of the reduction is driven by lower yield on advertising spend from BetterHelp. The remainder of the revision is driven primarily by our lower chronic care revenue outlook as well as a modest increase in our assumption for wage growth due to higher inflation as we grow our headcount in technology and development.

As a result of these updates, we now expect revenue of $2.4 billion to $2.5 billion and adjusted EBITDA of $240 million to $265 million for fiscal year 2022 We are not providing today any guidance with respect to periods after 2022, and we're evaluating whether there will be effects to our long-term revenue growth outlook.

72.    On the same call, Defendant Murthy addressed Teladoc's $6.6 billion non-cash goodwill impairment charge, stating:

Net loss per share in the first quarter was $41.58 compared to a net loss per share of $1.31 in the first quarter of last year. Net loss per share in the first quarter includes a non-cash goodwill impairment charge of $41.11 per share or $6.6 billion. The goodwill impairment was triggered by the sustained decline in Teladoc Health share price with the valuation and size of the impairment charge driven by a combination of recent market-based factors, such as an increased discount rate and decreased market multiples for a relevant peer group of high-growth digital health care companies as well as updates to our forecasted cash flows consistent with the revised guidance disclosed today.

73.    On April 28, 2022, investor news resource *Seeking Alpha* published an article entitled "Teladoc draws downgrades after 1Q revenue miss[,]" noting that the Company's "shares have lost more than a third of value to reach a 52-week low on Thursday after the telehealth company missed Street forecasts for its 1Q 2022 revenue prompting many analysts to downgrade the stock[,]" while citing analysts from Citi, Credit Suisse, and Wells Fargo, stating:

The financials "reveal cracks in TDOC's whole health foundation as increased competitive intensity is weighing on growth and margins," Citi analyst Daniel Grosslight said after discussions with the management.

The issues were particularly notable in the company's fastest growing direct-to-consumer mental health and chronic care segments, which, according to the analyst, were expected to drive growth over the next three years.

Despite the reluctance to make widespread changes to the thesis based only on one poor quarter, Grosslight said: "We are doubtful that we will see the competition-driven headwinds abate anytime soon."

Expecting Teladoc (TDOC) shares to trade in a narrow range over the next twelve months, the analyst downgrades the stock to Neutral from Buy, with the price target lowered to $43 from $115 per share, implying a downside of ~23.2% to the last close.

Credit Suisse analysts led by A.J. Rice downgraded Teladoc (TDOC) to Neutral from Outperform, noting, among other things, the company's underwhelming full year outlook. The price target slashed to $35 from $114 per share indicates a downside of ~38% to the last close.

"TDOC is seeing an elongated sales cycle as employers and health plans evaluate their long-term strategies to deliver the benefits and care their populations need," the team noted.

The analysts argue that, as a result the company has lowered its estimate for revenue yield for dollar of ad spend and recognized a $6.6B goodwill impairment to reflect ~75% and ~66% decline in revenue and EBITDA, respectively.

Q1 results disprove its Bullish thesis and signals "significant uncertainty for the trajectory of revenue and margins over both the near and intermediate term," Wells Fargo's Stephen Baxter and Stan Berenshteyn wrote as they downgraded the stock to Equal Weight from Overweight. The price target lowered to $40 from $104 per share implies a downside of ~29% to the last close.

74.    On this news, Teladoc's stock price fell $22.48 per share, or 40.15%, to close at $33.51 per share on April 28, 2022.

75.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred and will continue to incur significant financial losses, including, but not limited to, the costs of defending and potentially paying class wide liability in the Securities Action. These damages also include the costs of remediating deficiencies in the Company's internal controls, compensation and benefits paid to the Individual Defendants, who breached their duties to Teladoc, and reputational harm and loss of goodwill.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

76.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

77.   Teladoc is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

78.   Plaintiff is a current shareholder of Teladoc and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

79.   At the time this action was commenced, the ten Director Defendants comprised the Teladoc Board. Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's ten current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

80.   The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

81.   The Director Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Director

Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

82.     As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Teladoc, the Director Defendants knew, or should have known, the material facts surrounding the Company's BetterHelp and chronic care businesses, as well as the accuracy of the Company's public reporting.

83.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

84.     Defendants Daniel, Jacobson, and Shedlarz are not disinterested or independent, and therefore, are incapable of considering a demand because they serve as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, the integrity of the Company's financial statements and compliance with legal and regulatory requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's BetterHelp and chronic care businesses and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Daniel, Jacobson, and Shedlarz cannot independently consider any demand to sue

themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

85.     Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Teladoc stock and stock options they held.

86.     The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

87.     Furthermore, demand in this case is excused because the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other, precluding the Director Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Director Defendants would be futile.

88.     Significantly, the Director Defendants have not taken remedial action to redress the conduct alleged herein.

89.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

26

intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

90.     The acts complained of herein constitute violations of fiduciary duties owed by Teladoc's officers and directors, and these acts are incapable of ratification.

91.     The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Teladoc. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Teladoc, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

92.     If there is no directors' and officers' liability insurance, then the directors will not cause Teladoc to sue the Individual Defendants named herein, since, if they did, they would face

a large uninsured individual liability. Accordingly, demand is futile in that event as well.

93.     Thus, for all of the reasons set forth above, all of the directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against The Individual Defendants For Violations of § 10(b)
### of the Exchange Act and Rule 10b-5, 17 C.F.R. § 240.10b-5

94.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

96.     The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97.     The Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Teladoc common stock.

98.     The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Teladoc were materially false

and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

99.     The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Teladoc, their control over, and/or receipt and/or modification of Teladoc's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Teladoc, participated in the fraudulent scheme alleged herein.

100.     As a result of the foregoing, the market price of Teladoc common stock was artificially inflated during the Relevant Period. In ignorance of the falsity of the statements, stockholders, including Plaintiff, relied on the statements described above and/or the integrity of the market price of Teladoc common stock in purchasing Teladoc common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

101.     In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of § 10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

### Against The Individual Defendants For Breach Of Fiduciary Duty

102.     Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

103.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

104.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

105.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

106.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

107.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting

in an increased cost of capital, and reputational harm.

### COUNT III

**Against The Individual Defendants For Aiding and
Abetting Breach of Fiduciary Duty**

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

110.    Plaintiff on behalf of Teladoc has no adequate remedy at law.

### COUNT IV

**Against The Individual Defendants For Unjust Enrichment**

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Teladoc.

113.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Teladoc that was tied to the performance or artificially inflated valuation of Teladoc, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

31

114.    Plaintiff, as a shareholder and a representative of Teladoc, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

115.    Plaintiff on behalf of Teladoc has no adequate remedy at law.

## COUNT V

### Against The Individual Defendants For Waste Of Corporate Assets

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

118.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and colleting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

119.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

120.    Plaintiff on behalf Teladoc has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein,

together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.      Awarding punitive damages;

E.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: August 9, 2022

**OF COUNSEL:**

**ROSCA SCARLATO LLC**
Alan Rosca
23250 Chagrin Blvd., Suite 100
Beachwood, OH 44122
Telephone: (216) 946-7070
Email: arosca@rscounsel.law

Paul Scarlato
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Email: pscarlato@rscounsel.law

**RIGRODSKY LAW, P.A.**

By:  */s/ Gina M. Serra*
    Seth D. Rigrodsky
    Timothy J. MacFall
    Gina M. Serra
    Vincent A. Licata
    825 East Gate Boulevard, Suite 300
    Garden City, NY 11530
    Telephone: (516) 683-3516
    Email: sdr@rl-legal.com
    Email: tjm@rl-legal.com
    Email: gms@rl-legal.com
    Email: vl@rl-legal.com

    *Attorneys for Plaintiff*